**UNITED STATES of America, Plaintiff,**

v.

**W. A. KEELING, Defendant.**

**UNITED STATES of America, Plaintiff,**

v.

**L. E. CLARKSON, Defendant.**
**Civ. A. No. 377 and 378.**

United States District Court
W. D. Arkansas, Harrison Division.
May 21, 1955.

Charles W. Atkinson, U. S. Atty., Robert E. Johnson, Asst. U. S. Atty., Fort Smith, Ark., for plaintiff.

Fitton & Adams, Harrison, Ark., for defendants.

JOHN E. MILLER, District Judge.

### Statement

Because of the common questions of fact and law involved, Civil Actions 377 and 378 were consolidated for trial with the consent of all interested parties. The two cases were tried before the Court, without a jury, on May 17, 1955, and at the conclusion of the trial the Court, having considered the pleadings, ore tenus testimony of witnesses, exhibits, and stipulations, orally announced its findings of fact and conclusions of law, and in accordance therewith, the Court now makes and files herein its formal Findings of Fact and Conclusions of Law, separately stated.

### Findings of Fact

**1.**

The plaintiff in each of the cases is the United States of America. The defendant, W. A. Keeling, in Civil Action 377, is a citizen and resident of the Western District of Arkansas, Harrison Division. The defendant, L. E. Clarkson, in Civil Action No. 378, is a citizen and resident of the Western District of Arkansas, Harrison Division.

**2.**

On January 12, 1953, Lester Keeling executed a chattel mortgage, securing notes in the principal sum of $3,550, in favor of the United States of America, upon certain cattle then owned by the said Lester Keeling, including four cows described as follows: 1 Cow (½ Poll, red, "Reddie", 800 lbs., 8 yrs.) ; 1 Cow, Jersey, brown, "Brownie", 650 lbs., 4 yrs.; 1 Cow, Jersey, black, "Blackie", 750 lbs., 8 yrs.; 1 Cow, Guernsey, yellow, few white spots, 750 lbs., 6 yrs.

During the summer of 1953 a severe drouth occurred and there was insufficient pasture and water for the cattle. The Mortgagor, Lester Keeling, went to Iowa to work and left the cattle in charge of his wife and children. The defendant, W. A. Keeling, who is the father of Lester Keeling, talked to Mr. Harold E. Foster, County Supervisor of the Farmers Home Administration, and advised him of the situation.

On August 3, 1953, Mr. Foster executed Standard Form FHA–851, releasing the lien of the United States upon certain conditions, and permitting Lester Keeling to sell several of the cattle covered by the chattel mortgage. At that time eleven cows and seven calves were sold and the money applied upon the notes of Lester Keeling held by the United States.

**3.**

Conditions continued to grow worse, and in January of 1954, it was decided to sell the remaining cattle. On January 26, 1954, Mr. Foster executed another Form FHA–851, permitting Lester Keeling to sell the remaining cattle, including the four cows listed in Finding of Fact No. 2. The Form executed by Foster gave Lester Keeling permission to

sell the cattle, but did not give him permission to exchange the cattle.

**4.**

When Lester Keeling began preparing to sell the remaining cattle, it was learned that the red cow "Reddie" was sick and might not be able to make it to the market. The defendant, W. A. Keeling, thinking that he could doctor the red cow and get her back in good condition, traded to his son, Lester Keeling, a four year old white face cow for the red cow. The white face cow was in good health and was worth more on the market than the red cow was worth. As a matter of fact, the red cow died within about two months after the exchange.

The white face cow was sold by Lester Keeling and the proceeds were applied on the payment of his notes to the United States.

**5.**

While Lester Keeling was preparing to sell the remaining cattle, he also approached the defendant, L. E. Clarkson, and offered to trade the brown cow, "Brownie", the black cow, "Blackie", and the yellow Guernsey with a "few white spots," for three of Clarkson's cows. Clarkson was in the milk business and needed cows that were fresh. On the other hand, Lester Keeling was selling his cows at the market and needed cows that were in good health and physical condition. The three cows, above-mentioned, belonging to Lester Keeling, had not been properly cared for and were not in good market condition. However, they had recently had calves and were fresh, and therefore were more suitable for Clarkson's purposes. Clarkson had three cows that had been well fed and were in good market condition, but which had become dry and of no present value for milk production. (Also, one of them was a "kicker."). In view of the mutual advantages that would accrue to them, Lester Keeling and Clarkson decided to trade the three fresh cows of Lester Keeling for the three cows owned by Clarkson.

The three cows which Clarkson traded to Lester Keeling were sold at the market and the proceeds applied on his indebtedness to the United States.

**6.**

The cows traded by the defendants, W. A. Keeling, and L. E. Clarkson, to Lester Keeling, brought more on the market than the cows traded by Lester Keeling to said defendants would have brought, and the United States has suffered no damages by reason of said exchanges.

**7.**

After the proceeds from the sale of the cattle have been applied upon Lester Keeling's indebtedness, there still remains due and unpaid the sum of $2,772.83.

**8.**

On January 30, 1954, which was two days after the sale of the remainder of Lester Keeling's cattle (including the three cows that had been traded to him by L. E. Clarkson and the cow traded to him by W. A. Keeling), the defendant, W. A. Keeling, discussed the matter with Mr. Foster and informed Foster of the exchanges that had been made. Thereafter, Foster, with knowledge of the exchanges, accepted the proceeds from the sale of the cattle, including the said four cows traded to Lester Keeling by W. A. Keeling and L. E. Clarkson, and applied said money on Lester Keeling's indebtedness to the United States.

### Discussion

There are two reasons requiring the Court to deny plaintiff's claim in the instant case.

■ It is true that ordinarily the sale of mortgaged chattel by the mortgagor without consent of the mortgagee constitutes a conversion, for which both the mortgagor and the purchaser are liable. May Way Mills, Inc., v. Jerpe Dairy Products, 202 Ark. 397, 150 S.W.2d 615; Mitchell v. Mason, 184 Ark. 1000, 44 S.W.2d 672. And it seems that a similar rule would apply in the event of

an unauthorized exchange, such as occurred in the instant case.

However, if the mortgagee accepts the proceeds of the sale of the mortgaged property, with knowledge of their source, the mortgagee ratifies the unauthorized sale and cannot recover against the purchaser for conversion. United States v. Fleming, D.C.Iowa, 69 F.Supp. 252, 257, 262.

Similarly, in the instant case since Mr. Foster, the County Supervisor, accepted the proceeds from the sale of the exchanged cows with knowledge of the exchanges, he thereby ratified said exchanges and plaintiff cannot recover against the defendants for conversion.

And even if plaintiff were entitled to prosecute the action for conversion there could be no recovery since plaintiff has suffered no damage by reason of the conversion. The general rule is stated in 14 C.J.S., Chattel Mortgages, § 275, p. 904, as follows:

"In an action to recover damages or the value of mortgage property from a purchaser thereof, as where the purchaser is guilty of a conversion of the property, the amount recoverable is generally either the value of the property up to the amount due under the mortgage, or the balance due to the extent of the value of the property, according to which is the lesser sum. * * * There should be deducted from the damages allowed the value of any property, or the amount of any sums, received by the mortgagee for application on the debt; * * *. If the mortgagee has sustained no actual damages, only nominal damages will be awarded."

Compare, Boddy v. Thompson, 179 Ark. 71, 14 S.W.2d 240.

In the instant case plaintiff was not damaged by the exchanges, but in fact was benefited by them, and in view of the fact that plaintiff gained by the exchanges even nominal damages should not be recovered.

### Conclusions of Law

**1.**

The Court has jurisdiction of the parties to and the subject matter of this action.

**2.**

The plaintiff ratified the exchanges involved herein and the defendants were not guilty of conversion.

**3.**

The plaintiff was not damaged by any action of the defendants, and the complaint of the plaintiff should be dismissed.

A judgment in accordance with the above should be entered.